**GENERAL TRUCKDRIVERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL NO. 5, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 24363.

United States Court of Appeals
Fifth Circuit.

Jan. 24, 1968.

William C. Bradley, Baker, La., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Peter M. Giesey, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty.,

N. L. R. B., Washington, D. C., for respondent.

Before COLEMAN and GOLDBERG, Circuit Judges, and HANNAY, District Judge.

HANNAY, District Judge:

This is a Petition for Review of an order by the NLRB adjudging liability and a cross-application by the Board for enforcement of that order.

The Board found that the Petitioner engaged in unfair labor practices against its union member, Joseph D. Albin, and violated his rights under two separate sections of the Labor Management Relations Act of 1947, to-wit, Section 8(b) (1) (A), Title 29, U.S.C.A. Section 158(b) (1) (A), and Section 8(b) (2), Title 29, U.S.C.A. Section 158(b) (2). The Section 8(b) (1) (A) violation concerned a finding of direct action against Albin personally in his being threatened with a pistol by Petitioner's agent, one Edward G. Partin. The Section 8(b) (2) violations concerned actions against Albin's employer, the Ryder Truck Lines, and consisted of insistence on Albin's discharge, threats of concerted action, and a massive protest gathering at Ryder's terminal.

Petitioner's attack upon the validity of the Board order is two-fold: 1) that the Board lacked jurisdiction because there was still a remedy available to Albin under this collective bargaining contract with Petitioner and 2) that there is an insufficency of evidence in the record to support the findings of the Trial Examiner and the Board.

I.

Instant case is a dispute between a union member and the union. It is not a dispute between an employer and a union—the parties to whom the arbitration agreement in question expressly applies. In these circumstances, the jurisdictional authority of the Board here is provided by Section 10(a) of the Act, Title 29, U.S.C.A. Section 160(a), which, in material portions, provides, inter alia,

"The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. *This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * *"* (Emphasis added throughout).

The effective application here of the foregoing provision of the Act is illustrated in language contained in the United States Supreme Court case of Carey v. Westinghouse Corp., 375 U.S. 261, at 271, 84 S.Ct. 401, 11 L.Ed.2d 320, to-wit:

"There is no question that the Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award. Section 10(a) of the Act expressly makes this plain, and the courts have uniformly so held. * * *" Quoting from International Harvester Co., 138 N.L.R.B. 923, 925–926. 375 U.S., at 271, 84 S.Ct., at 408.

In any event, the mere existence of an unexercised right of arbitration where the essential and ultimate issue is one of an unfair labor practice within the meaning of the Act does not deprive the Board of jurisdiction. N.L.R.B. v. Acme Industrial Co., 385 U.S. 432, 436–437, 87 S.Ct. 565, 17 L.Ed.2d 495 and New Orleans Typographical Union No. 17 v. N.L.R.B., 5 Cir., 368 F.2d 755, 763 (1966).

II.

The record reveals that there had been several years of serious and even bitter intramural union opposition and rivalry between Albin and Partin.

In 1960–1961, for several consecutive months, Albin worked for the Petitioner-union, hereafter called Local 5, as an organizer. In the spring of 1961, he accepted employment with Ryder Truck Lines at Baton Rouge, Louisiana. In the fall of 1961, Albin filed union charges against one Edward Partin, the

secretary-treasurer and business manager of Local 5, alleging, among other things, that the latter had misappropriated Union funds. One A. G. Kline, a member of Local 5, joined Albin in bringing these charges. Partin joined the issue by filing counter charges with the Executive Board of Local 5. Albin secured the signatures of some three hundred members of Local 5 to a petition requesting the Teamsters International to investigate Partin and Local 5.

The Executive Board of Local 5 exonerated Partin; and, upon finding Albin and Kline guilty of the counter charges, it expelled them from the local union. On appeal from the Local decision to the union appellate agency, all parties were exonerated.

In the beginning of 1962, Albin was laid off by Ryder Truck Lines. The dispute with Partin intensified. Albin filed a grievance with Local 5 and appealed to the International the union decision that had exonerated Partin. In the spring of 1962, the International sent a panel to hear the controversy in Baton Rouge. When this hearing came to pass a threat of physical violence against Albin and Kline was made by an agent of Local 5. Shortly thereafter both he and Kline were knocked to the ground and beaten. *This episode of threat and ensuing assault coincided with the hearing before the International in Baton Rouge.*

During 1963, Albin accepted reinstatement with full rights at the Teamster's New Orleans terminal. In that same year, however, the Company changed its operations. This change of operations called for a transfer of nearly all of the New Orleans employees to either the Company's Houston or Baton Rouge terminals. Albin elected to transfer to Baton Rouge. This was destined to rekindle the dispute with Partin.

There is evidence in the record that Partin had previously declared that Albin would not be restored to his Local 5 membership in Baton Rouge. When it was made known to him that Albin would be coming back to Local 5 under the Company's change in operation, Partin, directly and indirectly, had the Company notified that Albin would not be allowed to return on the technical grounds that Albin was no longer a member of Local 5. Later, it became known that Albin had successfully bid upon one of the job openings at the Baton Rouge terminal. The record shows that Partin thereupon reiterated to Robert Begeman, Ryder's director of maintenance, that Albin would not be permitted to work under Local 5 jurisdiction. More specifically, Partin warned that if Albin returned to Baton Rouge:

" * * * the operations could be shut down * * * that there could be slowdowns, that in some of the places where [Ryder] trucks would be sent to load or unload, they would not be loaded or unloaded".

Albin's transfer to the Baton Rouge terminal was effected in late June of 1965. The following day, at their first meeting in the new circumstances, a serious incident occurred between the two men. The record reflects that Partin cursed Albin and, without apparent provocation by Albin, uttered a death threat. This verbal threat was accompanied by Partin displaying the handle of an automatic pistol carried in the waistband of his trousers. Third parties intervened and led Partin from the premises.

The testimony on the details of this point is not undisputed; nonetheless, there is substantial evidence to support the findings of the administrative authorities below and their findings on this issue are not clearly erroneous. See and compare: N.L.R.B. v. Local 294, International Brotherhood of Teamsters etc., 2 Cir., 317 F.2d 746, 749.

The day following the aforementioned incident with Partin, Albin, while in the line of duty, became engaged in a fight. The record reflects that this incident was with a recently employed member of Local 5, that the fight was without provocation on Albin's part, and that Albin's actions on this occasion were in

mere response to verbal abuse and physical assault. In consequence of the fight, both combatants were discharged from employment.

Less than two months thereafter Albin was ordered reinstated and made whole by the order of the Southern Conference Area Committee. The decision was made pursuant to Albin's timely allegation of a grievance.

Now to be considered is the evidence of record concerning Partin's alleged prevention of Albin's reinstatement pursuant to the aforementioned administrative order.

The record reflects that Partin immediately threatened to put Ryder Truck Line on strike if Albin were reinstated pursuant to the order. While threat of strike was on the basis that there would be no other alternative, the following day brought forth evidence that Partin was moving forward with preparations to effect a strike. In consequence, Albin was told by his supervisor that his work assignment for the day (August 25, 1965) would be to remain at home.

It is evident that Partin declared the strike that afternoon. By 2:00 p. m., some 200 to 300 men had gathered at the Baton Rouge terminal. The record indicates that some of them were carrying sticks and that they were not Ryder employees. Partin's control over them is made evident by the record; his previously declared purpose to strike was for all practical purposes in effect. The suggestion that some of the strikers might even kill Albin was intimated by Partin.

With the knowledge that Albin would not come to work that afternoon and in response to the request of Ryder's director of labor relations, one Louis Creekmur, Partin eventually addressed the assembled group of strikers. After this the group dispersed and departed.

In fact, Albin was not permitted to return to work at the terminal until January of 1966; this was in apparent response to higher union insistence concerning the order of August 1965.

### III.

The conclusions of the Board differ from that of the Trial Examiner in that the former found that the threat-to-kill incident by Partin of June 1965 was not merely the outgrowth of personal hostility between the men. The Board found that Partin's threat was motivated by Albin's intra-union opposition to him and that action constituted protected activity within the meaning of the Act.

█ It is clear that a physical threat to bar an employee from his employment is a violation of Section 8(b) (1) (A) of the Act. Title 29, U.S.C.A., Section 158(b) (1) (A). N.L.R.B. v. International Woodworkers of America, 5 Cir., 243 F.2d 745; N.L.R.B. v. United Packinghouse Workers, Local 680, 5 Cir., 274 F.2d 816; N.L.R.B. v. Local No. 3887, United Steelworkers of America, 5 Cir., 290 F.2d 587, 588; N.L.R.B. v. Local 140, United Furniture Workers of America, 2 Cir., 233 F.2d 539. The essence of the issue is whether the coercion, intimidation, or violence is calculated to deter or discourage legislatively protected union activity. Gullett Gin Co., Inc. v. N.L.R.B., 5 Cir., 179 F.2d 499, reversed on other grounds and modified in a different respect, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337.

█ Likewise, threats to the employer company constitute violations of the pertinent portions of the Act which prohibit such indirect discrimination, or attempted discrimination, against an employee because of his legitimate intra-union activity. N.L.R.B. v. Houston Maritime Association, 5 Cir., 337 F.2d 333; N.L.R.B. v. Imparato Stevedoring Corp., 3 Cir., 250 F.2d 297.

█ The findings of fact below are clearly supported by substantial evidence in the record before this Court. The applicable principles of law require that the Board's application for enforcement of its order should be, and it is hereby,

Granted.